**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **RICHARD AARON COBB,** | § | |
| Petitioner, | § | |
| **v.** | § | No. 2:08cv123 |
| **RICK THALER, Director,** | § | |
| Texas Department of Criminal | | |
| Justice, Correctional Institutions | § | |
| Division, | | |
| Respondent. | § | |
| | § | |

<u>**MEMORANDUM OPINION**</u>

Richard Aaron Cobb ("Cobb"), an inmate confined in the Texas Department of Criminal

Justice, Correctional Institutions Division, filed a petition for a writ of *habeas corpus* on

December 4, 2008.  He challenged the death sentence imposed in the 2nd Judicial District Court

of Cherokee County, Texas in cause No. 15054, styled *The State of Texas vs. Richard Aaron*

*Cobb.*  For the reasons set forth below, the Court finds that the petition is not well-taken and it

will be denied.

**Factual and Procedural Background**

Cobb and Beunka Adams teamed up to commit two armed robberies in August of 2002.

On September 2, 2002, they decided to rob a convenience store in Jacksonville, Texas.  After

taking the money from the cash register, they took Nikki Ansley and Candace Driver, the two

1

clerks working at the store, and Kenneth Vandever, a customer, hostage. Using Driver's car, Cobb and Adams drove to a rural area northeast of Alto, Texas. Cobb held the shotgun on the hostages most of the time. When the car arrived at an area known as the "pea patch," Adams ordered Driver and Vandever into the trunk of the car, then took Ansley into a wooded area and raped her. Adams and Cobb then tried putting all three hostages into the trunk of the vehicle but then tied up the two female hostages, intending to leave with Vandever and then allow him to return and untie them. When Vandever began to protest, Cobb shot him. Cobb and/or Adams then shot the other two hostages as well (it is unclear which perpetrator shot which victim). After satisfying themselves that the three were dead, Cobb and Adams left the area and ditched the vehicle. They then went to the residence of Adams's cousin, Michael Hackett, and asked him to take them to a house in Jacksonville, Texas.

Vandever died from his wounds, but Ansley and Driver both survived and, after regaining consciousness, managed to get to safety. Ansley told law enforcement that she believed she had gone to school with one of her attackers. Based upon her description, investigators obtained the names of Cobb and Adams from school authorities. Ansley identified both Cobb and Adams as her kidnappers. Driver identified Adams but was unable to identify Cobb. Hackett contacted police and provided Cobb's and Adams's whereabouts. They were arrested the next day. Under questioning, Cobb confessed to participating in the robbery and kidnaping and to shooting Vandever.

On September 23, 2002, Cobb was indicted for capital murder in Cherokee County under Tex. Crim. Code § 19.03(a)(2), killing in the course of committing another felony (in this case, kidnaping and robbery). His trial began on January 5, 2004, and on January 23, 2004, he was

2

sentenced to death.  Cobb's conviction and sentence were affirmed on direct appeal.  *See Cobb v. State*, No. AP-74875, 2007 WL 274206 (Tex. Crim. App. Jan. 31, 2007) (not designated for publication).  Cobb then filed an application for post-conviction relief in the state court, which was also denied.  *Ex parte Cobb*, No. WR 68,192-01, 2007 WL 4306840 (Tex. Crim. App. Dec. 5, 2007) (not designated for publication).  He filed an "Addendum to Application for Writ of Habeas Corpus," but the state court treated it as a subsequent application and dismissed it as an abuse of the writ.  *Ex Parte Cobb*, No. 68,192-02, 2007 WL 4306840 (Tex. Crim. App. Dec. 5, 2007) (not designated for publication).  On December 4, 2008, Cobb filed an application for a writ of *habeas corpus* in this Court.

**Claims Presented for Review**

Cobb raised eleven claims in his application:

1. The State of Texas violated the rule in *Brady v. Maryland* when it withheld evidence which could have been used to impeach the credibility of a witness.

2. The special sentencing issue number two (the mitigation question) conflicts with the Supreme Court of the United States' decision in *Mills v. Maryland.*

3. The trial court erred when it relieved the state of its constitutional burden to prove insufficient mitigating factors beyond a reasonable doubt.

4. The Supreme Court's holding in *Maynard v. Cartwright* requires that the term "probability of committing future criminal acts of violence" be defined.

5. The Texas death penalty scheme is unconstitutional because it limits the factors that jurors are to consider when answering special issue number 2 (the mitigation question), which conflicts with the Supreme Court's decisions in *Tennard v. Dretke*, *Boyde v. California*, and *Payne v. Tennessee*.

6. The Texas death penalty scheme conflicts with the Supreme Court's decision in *Tennard v. Dretke* by failing to require the jury to consider evidence of mitigation.

7.  The Texas death penalty scheme is unconstitutional in violation of the Eighth Amendment as interpreted in *Penry v. Johnson* because the mitigation special issue sends mixed signals to the jury, thereby rendering any verdict reached in response to that special issue unreliable.

8.  The Texas death penalty scheme is unconstitutional because it provides the unfettered discretion as prohibited by the Supreme Court's decision in *Furman v. Georgia.*

9.  The Texas death penalty scheme is unconstitutional because it prevents meaningful appellate review.

10. The Texas death penalty scheme is unconstitutional because it is founded on the jurors' inability to predict future danger in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

11. The Texas death penalty scheme is unconstitutional for its failure to provide proportionality review.

**Standard of Review**

Because Cobb's application for *habeas corpus* was filed after 1996, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies to his claims.  Under the AEDPA, a state prisoner seeking to raise claims in a federal petition for *habeas corpus* ordinarily must fairly present those claims to the state court and thereby exhaust his state remedies.  *Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001), *cert. denied sub nom. Martinez v. Cockrell*, 534 U.S. 1163 (2002).  If an applicant raises a claim in his federal *habeas corpus* application that was not fairly presented to the state courts, the federal court has three options.  It can allow the applicant to return to state court and present the claim to the state court in a successive petition, either by dismissing the entire petition without prejudice, *see Rose v. Lundy*, 455 U.S. 509, 520-22 (1982), or by staying the federal proceedings, *see Rhines v. Weber*, 544 U.S. 269, 278 (2005).  If it is

entirely clear that the state court would refuse to consider the merits of the claim if the applicant were to return to state court and present it in a successive petition, the federal court will treat the unexhausted claims as if the state court had already refused to hear them on procedural grounds. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). If it is not entirely clear that the state court would refuse to hear a successive petition containing the new claims, however, the federal court will allow the state court the first opportunity to consider them. *See Wilder v. Cockrell,* 274 F.3d 255, 262-63 (5th Cir. 2001). Finally, the Court can deny the claim on its merits. *See* 28 U.S.C. § 2254 (b)(2).

Federal courts generally do not review claims that the state courts have refused to review based on adequate and independent state grounds unless the applicant can establish either that he had good cause for failing to fairly present his claims, and he would be prejudiced by not being given an opportunity to do so in the federal court, or that the federal court's failing to address the claims on their merits would result in a fundamental miscarriage of justice because the petitioner is actually innocent of the offense. *See Coleman v. Thompson,* 501 U.S. 722, 749-50 (1991); *Finley v. Johnson,* 243 F.3d 215, 220 (5th Cir. 2001).

If the state court denied the claim on its merits, a federal court may only grant relief if the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, *see* 28 U.S.C. § 2254 (d)(1), or if the state court's adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, *see* 28 U.S.C. § 2254 (d)(2). In reviewing a state court decision, this Court reviews questions of law and mixed questions of law and fact under section

2254(d)(1), and reviews questions of fact under section 2254(d)(2).  The state court's findings of fact are presumed to be correct, and the applicant has the burden of rebutting this presumption of correctness by clear and convincing evidence.  *Richardson v. Quarterman,* 537 F.3d 466, 472-73 (5th Cir.  2008), *cert. denied*, 129 S.Ct. 1355 (2009).  If a claim was presented to the state court but not adjudicated by that court, this Court will determine it *de novo,* just as factual issues not determined by the state court are determined *de novo.  See Miller v. Johnson,* 200 F.3d 274, 281 n.4 (5th Cir.), *cert. denied,* 531 U.S. 849 (2000).

If the state court based its decision on the alternative grounds of procedural default and rejecting the claim on its merits, the general rule in this circuit is that a federal court must, in the absence of good cause and prejudice, or a fundamental miscarriage of justice, deny relief because of the procedural default, *see Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005), *cert. denied*, 546 U.S. 1177 (2006), but the rule is not absolute; a court can look past the question of procedural default if the claims can be resolved more easily on the merits. *See Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir. ), *cert. denied*, 541 U.S. 1087 (2004).

**Analysis of Claims**

Cobb's first claim is that the State of Texas violated *Brady v. Maryland*[1] when it withheld impeaching evidence.  This claim was denied on the merits by the state court, *see* State Habeas Record ("SHR") Vol. 2, pp.107-08, Conclusions of Law 2 - 5, so the issue for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the

---

[1] 373 U.S. 83 (1963).

Supreme Court of the United States, or was the result of an unreasonable determination of the facts in light of the evidence presented to the state court.

During the guilt-determination phase of the trial, Cobb admitted participating in the robbery and kidnaping and shooting Vandever.  He testified, however, that he went into the store planning only to get money and leave, but Adams, as the leader, changed the plan and directed all of the ensuing events.  The testimony of the surviving victims corroborated this part of Cobb's testimony.  Cobb also testified, however, that Adams threatened to kill him unless he agreed to participate in killing the three hostages.  *See* Reporter's Record ("RR") Vol. 90, pp. 47 - 87.  The witnesses did not corroborate this part of Cobb's testimony, and, on cross-examination, Cobb admitted that he did not mention any coercion by Adams when he initially confessed to the authorities.  *Id*. at 99.

While Cobb was incarcerated at the Cherokee County Jail, he had several conversations with an inmate named William Elmer Thomsen ("Thomsen").  Thomsen was awaiting trial for illegal possession of a firearm by a felon.  At the time he was arrested on that charge, Thomsen was also on probation for another offense, so he was facing both revocation of his probation and imprisonment for the weapons charge.  Unbeknownst to Cobb, Thomsen contacted his personal attorney and instructed him to contact the District Attorney and see whether the District Attorney would agree to drop the charges and get him released in exchange for Thomsen's testifying to what Cobb told him.  The District Attorney told Thomsen's attorney that he did not make deals for testimony; nevertheless, the District Attorney's office dropped the weapons charge and contacted Thomsen's probation officer on two occasions informing him that it was not going to pursue that charge, and Thomsen did testify for the prosecution at both the guilt-determination

7

phase and the punishment-determination phase of Cobb's trial.

At the guilt-determination phase, Thomsen testified that in their jailhouse conversations Cobb talked extensively not only about the crime for which he was on trial, but also about two other aggravated robberies he committed.  Thomsen testified that Cobb said to him that he thought armed robberies were the way to go, because it's fast, quick, easy money, go in and pull a gun on somebody, get the money in a matter of seconds.  *See* RR Vol. 91, p. 49-50.  Thomsen also testified that Cobb told him that he and Adams had planned to commit another armed robbery after the crime for which he got arrested, and at his trial he planned on testifying that Adams had threatened him with death if he did not participate in the crime, even though he knew that it was not true.  *Id.*

The following colloquy took place during the defense's cross-examination of Thomsen:

Q.[2]   Mr. Thomsen, when you were in jail you started contacting your lawyer about trying to work a deal, didn't you?

A.  It wasn't really to make a deal, no sir.  When I contacted my lawyer in regards of the information I had, my charges had already been dismissed.

Q. But you were still in jail?

A.Yes sir, I was in jail on parole violation at that time.

Q. In fact, while you were – what happened to your felony felon in possession charge?

A.  It was dismissed.

Q. When?

A. I want to say latter part of November.

Q. Was that after these conversations with Mr. Cobb?

---

[2] The Reporter's Record incorrectly states that the prosecution is cross-examining Thompson.

A.  It was before – oh, it was during the conversation with Mr. Cobb but I had not had any contact with – I hadn't even had contact with my lawyer.

Q.  When did you first contact your lawyer about wanting to give information to the DA's office?

A.  I want to say it was either the last week of November or the first week of December.

Q.   Now, when is it you say you were released?

A.  From the jail?

Q.  Yeah.

A.  I was released from the jail the first part of January and transferred directly to a state facility for my parole violation.

Q.  Okay.  How long were you in jail?

A.  I was in Cherokee County Jail from October 21st until I think it was either the first or second week of January at which time I was transferred to the state facility until May of last year, six months total.

Q. Now, as far as your felon in possession charge you went to an examining trial on that, didn't you, to contest the charges?

A. Yes, sir.

Q. And in fact, the state didn't even show up at that hearing, did they?

A. No, sir.

Q. Is that the reason that was dropped?

A. I would assume so.  I didn't really get into details with my lawyer about that.  He just told me the case was dropped.

Q.  Were there conversations with and did you not, in fact, receive benefit as a result of your cooperation?

A.  No sir, I didn't.  There was no deal whatsoever.

Q.  Randy Hatch did not make a phone call to your parole officer on your behalf?

9

A. Oh, yes, sir.  Mr. Hatch did, in fact, make a phone call to my parole officer.

RR Vol. 91, pp. 50-52.

After the jury convicted Cobb of capital murder, the trial entered the punishment determination phase, in which the jury determined whether he would be sentenced to death or to life with the possibility of parole.  Under Texas law, the jury was required to determine whether there was a probability that Cobb would commit acts of criminal violence which would constitute a continuing threat to society.[3]  If they did so find, they were required to determine whether there were nevertheless mitigating circumstances such that a sentence of life imprisonment, rather than death, would be appropriate.  TEXAS CODE CRIM. PROC. art.37.071.

The prosecution put on evidence of Cobb's other criminal conduct prior to the capital murder, including the testimony of the victims of the two previous armed robberies.  They also presented testimony from several law enforcement officials who testified that Cobb had a bad reputation as far as obeying the law.  They presented additional testimony from Ansley about the severity of her physical and emotional injuries.  They presented testimony about the possibility of escape from prison, and they presented the testimony of Dr. Tynus McNeel, a psychologist who opined that Cobb fit the profile of a sociopath, a person who did not care about the welfare of other people and whose condition would be incurable.  They also offered the testimony of Cobb's juvenile probation officer, who testified that Cobb assaulted one of his boot camp supervisors, that he was not afraid of people in authority, that his mother had difficulty controlling him, and that his reputation as a law abiding citizen was bad.

---

[3] This is often referred to as the "future dangerousness" issue.

10

The prosecution also recalled Thomsen.  This time, he testified that Cobb told him that when he learned that the two girls survived he was mad, because if they had died he probably wouldn't be in jail.  RR. Vol. 94, p. 124.  He further testified that Cobb never expressed any remorse, which is why Thomsen was in court testifying.  Thomsen stated that Cobb said that he got almost like a rush when he shot Vandever.  This testimony caused Cobb to stand up and say "You lying son of a bitch, I never said no such thing," whereupon the trial judge excused the jury and warned Cobb, "If you expect to remain in this courtroom for the remainder of this trial you will stay in your seat and keep your mouth shut."  *Id.* at 125.  After the jury returned, Thomsen testified that Cobb told him that if he were put in the same situation, he would do it again.  Asked if Cobb ever said whose shotgun he used, Thompsen answered that Cobb said it was his, then added that Cobb "traded some gram of powder cocaine to some guy here in Rusk for it." Thomsen also testified that Cobb discussed escaping from jail "Numerous times.  He said if he ever had the chance and could figure out how to do it he would."  *Id*. at 126.  The defense did not cross-examine Thomsen.

The defense offered first the testimony of Cobb's adoptive mother, Edna Bell, who explained that Cobb and two of his brothers had been placed in foster care because their mother was unable to care for them, and that she decided to adopt all three of them.  Bell described all three boys as having serious emotional problems from the beginning of her caring for them.  She testified that she once visited the boys' mother's house and found it in horrific condition, with roach infestation.  Several witnesses testified that Cobb's biological mother had alcohol and drug addiction issues and that as a result, her children suffered from abuse and extreme neglect.  Bell testified that she loved and cared for the boys, and obtained psychological treatment for them, but

11

they all had acute problems growing up.  Bell testified that on one occasion Cobb protected her from a physical assault by one of his brothers.

Cobb testified that he started using drugs at age twelve.  He also testified that the reason he changed from doing burglaries to doing armed robberies was because he was in debt to a drug dealer and needed money quickly, and Adams suggested that armed robberies were an easier and better way to make money.

The defense also offered expert testimony that Cobb suffered some brain damage from his mother's alcohol and drug use while she was pregnant with him.

On the morning before final arguments, the prosecution became aware that the defense did not have a copy of a letter the District Attorney had written to Thomsen's parole officer.  The prosecutor pulled his file on Thomsen and could not find the letter, then asked his staff to find the letter.  The letter was brought to the prosecutor with the explanation that it had been found in the file of Cobb's co-defendant, Beunka Adams.  The prosecution then provided a copy of the letter to the defense.  It was written by the District Attorney and sent to Thomsen's parole officer. It was dated January 10, 2003, and said:

TO WHOM IT MAY CONCERN:

Re: William Thomsen

Please be advised that this office will not seek prosecution of the above individual for the offense of Unlawful Possession of Firearm by Felon.

If anything further is needed please contact this office.

Sincerely,

Elmer C. Beckworth, Jr.

The defense did not ask to reopen the case in order to introduce the letter into evidence.

At closing argument, defense attorney Morton argued:

> The other person who testified was Mr. Thomsen. He had a lists (sic) of felonies. You remember all the stuff that he testified – that he testified to. He got a deal. Some reason of another, you know, miraculously, convicted felon with several actual convictions, person having been in TDCJ. Who knows what kind of enhancements could have been derived from that? Miraculously decide not to show up at the examining trial or not to prosecute him any further. He had an awful lot to gain. As far as people who said, Why would he say these things? When Richard was – why would Richard say these things to people? He knew, Richard knew before he ever got to the jail that there were survivors. He talked to Ranger Flores, you know. The jail house snitches and so forth aren't always reliable and sometimes information is just not received properly or misunderstood. There is no reason for him to say that, he already knew that.

RR. Vol. 97, p.38-39. Defense attorney House argued:

> Mr. Thomsen. William Elmer Thomsen. Richard told you that he was always looking for a way to show a bruise or something so that he could claim that he was hurt in jail and sue the county. They didn't bring him back up here to deny that. I suspect that there were obviously claims or letters that he wrote somewhere along the line saying he had been hurt, this or that. He likes to fabricate evidence, information for his own benefit. I submit to you that's what he did when he talked about what he claimed Richard told him. Fabricated it for his own benefit. Number one, he gets a letter to his parole officer asking for leniency, We are not going to prosecute him. He has an examining trial to determine is there probable cause to hold him on his felon in possession of a firearm and the state doesn't even show up for the hearing; it's dropped, never to be brought up again.
>
> Would you allow William Elmer Thomsen to pick up your kids or grandkids from kindergarten? Would you invite William Elmer Thomsen to your home for dinner? I think not. Then how in the world can you rely on his testimony in making a life or death decision? That's what the State is asking you to do. They're asking you to rely on Tynus McKnight – Tynus McNeel and William Elmer Thomsen to vote for a sentence of death.

*Id.* at 48-49. The prosecution then argued:

> But he is asking, "How would you trust William Earl (sic) Thomsen? Would you have him pick up your kids, do anything?" He is probably right, I wouldn't. But somebody is, he is now a supervisor where he works. And on whatever deal he got contacting the parole board or the parole officer, he was revoked and got several months in the other facility. But what is important about Thomsen besides the fact

> he was the only person to be in the position to hear what Cobb said in the jail, is how
> did he know about these other robberies in Jacksonville?  How did he know the girls
> were on their knees praying?  And how did he know this location was called the pea
> patch?  That could have only come from one person, Richard Cobb.

*Id*. at 53.  After discussing how Cobb resisted arrest, the prosecution paraphrased what Thomsen

testified Cobb told him: "[He] [b]rags about his prior robberies, his intent to commit other robberies,

no remorse, would do it again and if he has his chance he would escape."  *Id.* at 56.


        Two months after Cobb's trial was completed, while the prosecutor was reviewing the

file of Cobb's co-defendant, Beunka Adams, he came across another letter involving Thomsen.

This letter, dated December 26, 2002,  was written by Thomsen and sent to the District Attorney.
It said:

> Mr. Beckworth-
> Greetings, Sir.  I hope your holidays were enjoyable-
> I'm sorry to bother you.  Last check - Mon., 12-21-02 that Felony Possession
> of a firearm by a Felon and the parole hold were still on the computer holding me in
> jail.  I have written my attorney Mr. Phifer 3 times this month reminding him that he
> needs to process the paperwork for the dismissal that occurred in Nov. on this gun
> charge.  It was supposedly dismissed in Nov., however, I never received the
> paperwork stating it --
> At our meeting in Mr. Hatch's office on 12-19-02 you agreed to completely
> clear this charge as well as to try to have the parole hold lifted so I could get released.
> Mr. Hatch tried to phone my parole officer – Roy Shamblin – directly after our
> meeting but was unable to locate him.  As you know the parole hold cannot be lifted
> until the gun charge is paperwork clear –
> The only reason I bother you with this is because all efforts by myself and my
> girlfriend to contact Mr. Phifer by letter and phone have gone astray – Could you
> please take steps to get Mr. Phifer in gear and have Mr. Hatch (remind him) to try
> contacting Roy Shamblin again – I realize the holidays have caused a slow process.
> I'm only asking for reminders for I'm sure everyone's mind is still in holiday mode
> – I would dearly love to at least spend New Years with my family.
> Also - you asked a question at our meeting if Richard Cobb told me why they
> decided to take the girls and Kenneth after robbing that store?  I now recall his
> answer was: They wanted the keys to a car – I believe [Adams] had removed his
> mask at this time and spoke Rich's name so they told the girls to come with them"!
> The girls said: "Please just take my car, here the keys, leave us here - we won't tell
> anything"!  It's on my notes I gave Mr. Phifer.  I just forgot it – you're welcome to

14

those notes if you would like to bring them in as evidence – Thank you for your time Sir –

>                                Sincerely,
>                                William Thomsen

In *Brady v. Maryland,* 373 U.S. 83, 87 (1963), the Supreme Court held that the prosecution in a criminal trial has a duty to disclose to the defense in a timely manner evidence that is material either to guilt or to punishment.   In *United States v. Bagley*, 473 U.S. 667, 676 (1985), it held that the duty to disclose extends to evidence that may be used for impeachment. Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome.   *Id.* at 682.

The state court concluded that the prosecution did not fail to disclose the second letter to the defense, because defense counsel would have found it had they looked in Adams's case file, *see* SHR Vol. 2, pp.107-108, Conclusion of Law 3, and it also concluded that the two letters were not material to the issue of punishment, because there was no reasonable probability that the outcome of Cobb's trial would have been different had defense counsel known about the letters earlier.   *Id.*, Conclusion of Law 5.   Cobb contends that both conclusions were unreasonable.

Regarding the first conclusion, the general rule is that in situations where exculpatory information is available to the defendant or lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* rule.   Put another way, *Brady* requires that the government disclose only evidence that it not available to the defense from other sources, either directly or through diligent investigation.   *See Scott v. Bazzle*, No. 8:05-cv-2690, 2007 WL 1031868 (D.S.C. Mar. 30, 2007).   The Director argues that the state court's conclusion

that the letters should have been discovered by the defense is the result of a reasonable

application of the rule in *Rompilla v. Beard*, 545 U.S. 374 (2005).  In *Rompilla*, a condemned

inmate claimed that his counsel rendered ineffective assistance because they failed to conduct a

reasonable investigation into potentially mitigating evidence.  Specifically, he argued that had his

counsel examined a file produced by the prosecution which was thought to contain only

aggravating evidence, they would have discovered that it also contained powerful mitigating

evidence.  The Supreme Court held that counsel in a capital case has a duty to obtain and review

material that they know the prosecution will probably rely on as evidence of aggravation at the

sentencing phase of their client's trial.  *Id.* at 383.

Assuming *arguendo* that the concepts of duty to investigate in the ineffective assistance

of counsel context and ordinary diligence in the *Brady* context are synonymous, the Director's

argument is unpersuasive because defense counsel in the present case did not know that the

prosecution would rely on evidence in co-defendant Beunka Adams's case file as evidence of

aggravation at the sentencing phase of their client's trial.  While it would have been good

practice for Cobb's counsel to review the case file of his co-defendant, unless they knew that

evidence the prosecution would rely on in Cobb's trial would only be found in Adams's file, they

had no duty to review Adams's file.  The Court therefore finds that the failure of defense counsel

in the present case to review the file of their client's co-defendant cannot be considered a lack of

ordinary diligence. The Court finds that the state court's conclusion that the letter was not

withheld by the prosecution is unreasonable.

Regarding the second conclusion, the jury was first required to determine whether there

was a probability that Cobb would be dangerous in the future.  Thomsen's testimony that Cobb

said he would escape if he could, felt no remorse, and had planned on committing further armed robberies was relevant and likely prejudicial.  But even without Thomsen's testimony, the jury still would most probably have decided that Cobb was likely to commit future acts of criminal violence and would be a continuing threat to society.  Dr. McNeel testified that past criminal conduct is considered the most valid predictor of future dangerousness, and the prosecution offered evidence of Cobb's consistent criminal activity and its increasing severity.   In response, the defense offered Cobb's testimony as to why the conduct occurred, but it did not offer evidence as to why the conduct would not continue.  On balance, the letter which would have been used to impeach Thomsen's testimony was not material.  That is, Cobb has failed to show a reasonable probability that, had the letter been timely produced, the jury would have found that Cobb would not be dangerous in the future.

The jury was then required to determine whether there were sufficient mitigating circumstances to justify imposing a sentence of life imprisonment, rather than death.  Evidence of severe deprivation and abuse in childhood has been found sufficiently likely to influence a jury's decision on whether to impose the death penalty that its absence can be considered material, *see e.g. Williams v. Taylor*, 529 U.S. 362, 395-96 (2000), *Wiggins v. Smith*, 539 U.S. 510, 534-37 (2003), and *Rompilla*, 545 U.S. at 390-93, and Cobb produced several witnesses who testified that he and his siblings had to be removed from their home by Child Protective Services because of severe and repeated neglect.  Cobb contends that because of this strong evidence, without crediting Thomsen's testimony which used words from Cobb's own mouth to refute his expressions of remorse and showed him to be cruel, deceptive and highly dangerous, there is a reasonable probability that the jury would have found that there were sufficient

mitigating circumstances in his character to justify a life sentence rather than a sentence of death.

There are two problems with Cobb's argument.  First, under Texas law a court cannot review the sufficiency of the evidence supporting a jury's negative answer to the mitigation question.  *See Collella v. Texas*, 915 S.W.2d 834, 845 (Tex. Crim. App. 1995).  Because the jury has unbridled discretion as to how to decide whether to impose a life sentence,  there is no way to determine whether there is a reasonable probability that, without crediting Thomsen's testimony, the jury would have determined that a life sentence, rather than death, was appropriate.  Second, even if it were possible to predict what the jury might have decided had it discredited Thomsen's testimony, it is not at all clear that the defense, even had it received the letters in a timely fashion, could have further impeached Thomsen's credibility.  The state court found that defense counsel insinuated the existence of "some kind of deal" during its aggressive cross-examination of Thomsen, and when they argued at closing that there was an agreement between the state and Thomsen, the State did not challenge, object to, or attempt to rebut the argument.  The Court further found that the letter from Thomsen to the District Attorney merely "requests information and help,"[4] and "was cumulative to information trial counsel already had which he used to cross-examine Thomsen and argue to the jury."  Finally, the Court found that there was "no undisclosed agreement for favorable treatment for William Elmer Thomsen."

The Court finds that the letter at issue was not material because it did not compellingly contradict Thomsen's testimony.  His letter to the District Attorney establishes that in their meeting, the District Attorney agreed to complete the administrative paperwork necessary to completely clear the charge and to alert his parole officer that it had been completely cleared.

---

[4] *Id.* at  p. 87, Finding of Fact No. 10.

There is no indication in the record that this is not what the District Attorney should have done, as a matter of course, in any case.  Further, while it is clear from his letter that Thomsen was very optimistic that he would be released from prison quickly as a result of the District Attorney's actions, his letter establishes that the District Attorney agreed to do no more than to contact his parole officer and inform him of the dismissal.  In addition, nowhere in Thomsen's letter does he state that he would testify in return for what the District Attorney agreed to do.

Accordingly, although defense counsel could have used the letters in cross-examination to show that Thomsen believed at the time he wrote the letter that he was going to receive a benefit from the District Attorney's office in the form of a prompt release from prison, the fact remains that he did not in fact get released promptly, and he had no expectation of receiving any benefit by the time he testified.  The Court therefore finds that even had the defense received the two letters at issue in a timely manner, they would not have been able to establish that Thomsen had received favorable treatment from the District Attorney's office in exchange for favorable testimony in Cobb's case.  The Court therefore finds that the State court's determination that the letters were not material was not based upon an unreasonable determination of the facts in light of the evidence presented at the state post-conviction proceedings, and because its conclusion was neither contrary to, nor the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court in *Bagley v. United States* and in *Brady v. Maryland,* the Court will deny Cobb's first claim.

Cobb's second claim is that special sentencing issue number two (the mitigation question) conflicts with the Supreme Court's decision in *Mills v. Maryland.*[5]  The state court

---

[5] 486 U.S.367 (1988).

found this claim procedurally barred, but also denied relief on the merits, *see* SHR Vol. 2, p. 106. The rule in this circuit is that under these circumstances a federal court must, in the absence of good cause and prejudice, or a fundamental miscarriage of justice, deny relief because of the procedural default, *see Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005), *cert. denied*, 546 U.S. 1177 (2006), but the rule is not absolute; a court can look past the question of procedural default if the claims can be resolved more easily on the merits. *See Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir. ), *cert. denied*, 541 U.S. 1087 (2004). The Court finds it easier to decide this issue on the merits, as it has been specifically rejected by the United States Court of Appeals for the Fifth Circuit in *Hughes v. Johnson*, 191 F.3d 607 (5th Cir. 1999).

In reviewing a claim that was denied on the merits by the state court, a federal court may only grant relief in *habeas corpus* if the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Cobb contends that the trial court should have, but did not, instruct the jurors that a vote of "yes" by a single juror as to special issue No. 2, would result in a life sentence.

Special sentencing issue No. 2 states:

> Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is significant mitigating evidence or circumstances to warrant that a sentence of life imprisonment rather than a death sentence should be imposed?

TEX. CODE CRIM. PROC. art. 37.071 provides in relevant part:

> You will answer Special Issue No. 2 "Yes" or "No".
> You may not answer the issue "No" unless all jurors unanimously agree to such answer, However, you may answer this special issue "Yes" in the event ten (10) or more jurors agree to such answer.

Cobb points out that under art. 37.071(e) any combination of "yes" and "no" votes other than all twelve votes being "No" results in a life sentence, but the jury is not told of this fact.

In *Mills v. Maryland*, the Supreme Court of the United States struck down a jury instruction which created a substantial probability that individual jurors may well have thought that they were prohibited from imposing a life sentence, rather than a death sentence, unless they agreed unanimously on a specific ground for mitigation.  486 U.S. at 374.  Cobb contends that the confusion in his case over the effect of a less than unanimous vote is similar to the confusion in *Mills* over the effect of less than unanimous agreement as to a specific mitigating factor.   In *Hughes v. Johnson*, however, the United States Court of Appeals for the Fifth Circuit rejected this precise argument.  Distinguishing the Texas sentencing scheme from the Maryland scheme because Texas jurors are not required to agree as to the specific evidence they find mitigating, the court then stated: "The Texas scheme allows a single juror to give effect to mitigating evidence by voting 'No' on any special issue.  The fact that they do not know the effect of their answers does not subject [the defendant] to cruel and unusual punishment." 191 F.3d at 629.  In light of *Hughes*, the Court finds that the state court's rejection of Cobb's second claim is neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Mills v. Maryland*.  The Court will deny Cobb's second claim.

Cobb's third claim is that the trial court erred when it relieved the state of its constitutional burden to prove insufficient mitigating factors beyond a reasonable doubt.  This claim was rejected on the merits in Cobb's direct appeal, *see Cobb v. State*, No. AP-74,875, 2007 274206 (Tex. Crim. App. Jan. 31, 2007), so the issue for the Court is whether the state court's

adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

As discussed above, special issue No. 2 requires the jury to determine whether mitigating circumstances exist which warrant the imposition of life imprisonment, rather than a sentence of death.  It does not, however, provide a burden of proof regarding mitigating evidence.  In *Ring v. Arizona*, 536 U.S. 584, 602 (2002), the Supreme Court of the United States held that "the Sixth Amendment requires any fact making the defendant eligible for the death penalty must be unanimously found true, beyond a reasonable doubt, by the jury."  Cobb contends that because special issue No. 2 does not require jurors to find beyond a reasonable doubt that the mitigating evidence is insufficient to justify imposing a sentence less than death, the Texas capital sentencing scheme is contrary to *Ring.*

In *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir.), *cert. denied*, 546 U.S. 848 (2005), the United States Court of Appeals for the Fifth Circuit rejected this precise argument, stating: "No Supreme Court or Circuit precedent constitutionally requires that Texas' mitigation special issue be assigned a burden of proof."  In light of *Rowell*, this Court finds that the state court's adjudication of Cobb's third claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Ring*.  The Court will deny Cobb's third claim.

Cobb's fourth claim is that the Supreme Court's holding in *Maynard v. Cartwright*[6] requires that the term "probability of committing future criminal acts of violence" be defined.

_____

[6] 486 U.S. 356 (1988).

This claim was not presented to the state courts, either on appeal or in state post-conviction proceedings, so it is unexhausted.  Under these circumstances, the Court has three options:  It can allow Cobb to return to state court and present the claim to the state court in a successive petition, treat the claim as if it were procedurally defaulted, or deny the claim on its merits.  In this case, the Court finds that the third option is most appropriate.

Under Texas law, the first of the two special issues which the jury must find in order to sentence a defendant to death is that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.  In *Maynard v. Cartwright,* the Supreme Court of the United States held that a sentencing statute violates the Eighth amendment if the terms used are so vague that they fail to adequately inform the jury what they must find in order to impose the death penalty, and as a result, leaves them and the appellate courts with essentially open-ended discretion.  The Court struck down an Oklahoma statute which provided that the jury find the killing committed by the defendant to be "especially heinous, atrocious or cruel," because the terms could mean different things to different jurors.  Cobb contends that the term "probability" in Texas' special sentencing issue No. 1 could also mean different things to different jurors.  While the Court finds some merit in this argument, the United States Court of Appeals for the Fifth Circuit has specifically rejected it on numerous occasions.  *See e.g. James v. Collins,* 987 F.2d 1116, 1120 (5th Cir.), *cert. denied*, 509 U.S. 947 (1993); *Milton v. Procunier,* 744 F.2d 1091, 1095-96 (5th Cir. 1984), *cert. denied*, 471 U.S. 1030 (1985).  In light of these cases, the Court finds that the state court's rejection of Cobb's fourth claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Maynard.*  The Court

23

will deny Cobb's fourth claim.

Cobb's fifth claim is that the Texas death penalty scheme is unconstitutional because it limits the factors that jurors are to consider when answering the second special sentencing issue (the mitigation question), which conflicts with the Supreme Court's decisions in *Tennard v. Dretke*,[7] *Boyde v. California*,[8] and *Payne v. Tennessee*.[9]  This claim was not presented to the state courts, either on appeal or in state post-conviction proceedings, so it is unexhausted.  In these circumstances, the Court has three options:  It can allow Cobb to return to state court and present the claim to the state court in a successive petition, treat the claim as if it were procedurally defaulted, or deny the claim on its merits.  In this case, the third option is most appropriate.

The Court notes that on page 62 of his application for a writ of *habeas corpus*, Cobb stated: "In his [state] application for habeas relief, Mr. Cobb urged that the Texas death penalty scheme is unconstitutional because it limits the type of evidence the jury is permitted to consider when answering the mitigation special question . . ." when in fact, he claimed the opposite.  *See* SHR Vol. 2, p.105: "[T]he special issue places no legal limitation on what circumstances are considered mitigating . . ."  More important, Cobb's statement in his state application is the correct one.  By its own terms, special sentencing issue No. 2 directs the jurors to take into account all of the evidence presented, both at the guilt-determination phase and at the sentence-determination phase of the trial.  Because Cobb's contention — that the terms of the second special sentencing issue limits the factors jury may consider — is factually incorrect, the Court

---

[7] 542 U.S. 274 (2004).

[8] 494 U.S. 370 (1990).

[9] 501 U.S. 808 (1991).

will deny his fifth claim.

Cobb's sixth claim is that the Texas death penalty scheme conflicts with the Supreme Court's decision in *Tennard v. Dretke* by failing to require the jury to consider evidence of mitigation. Although Cobb claims that he raised this issue on pp. 101-106 of his state application for post-conviction relief, what he actually did in state court was make four separate claims, each different from the present claim.[10] Because the claim Cobb now raises in this Court was not presented to the state courts, it is unexhausted. In this circumstance, the Court has three options: allow Cobb to return to state court and present the claim to the state court in a successive petition, treat the claim as if it were procedurally defaulted, or deny the claim on its merits.

The Court must first determine whether to allow Cobb to return to state court to present this claim. If it is entirely clear that the state court would refuse to hear a successive petition containing the new claim, the Court must treat the claim as if the state court had already rejected it on procedural grounds. Accordingly, the initial inquiry for the Court is whether it is entirely clear that court would refuse to consider the merits of this claim if Cobb were to return to state court and present it in a successive petition.

Tex. Code Crim. Proc. Art. 11.071 §5 provides that if a successive application for a writ of *habeas corpus* is filed after filing an initial application, a court may not consider the merits or grant relief on the application unless the application contains specific facts establishing that:

---

[10] Cobb claimed that the mitigation special issue violated the Due Process Clause of the Fourteenth Amendment because it did not provide a means for jurors to give effect to mitigating circumstances. He also claimed that the second special sentencing issue violated the Cruel and Unusual Punishment Clause of the Eighth Amendment for the same reason. He then claimed that the second special sentencing issue violated the Cruel and Unusual Punishment Clause because it shifts the burden of establishing mitigating circumstances to the defendant. His final claim was that the second special sentencing issue violated the Cruel and Unusual Punishment Clause because it required the jurors to weigh mitigating evidence against aggravating evidence, rather than requiring that they consider mitigating evidence by itself.

(1) the current claims and issues have not been presented previously because the factual or legal basis of the claim was unavailable on the date the applicant filed the initial application;

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the three sentencing issues.

In the present case, Cobb does not contend that either the factual or legal basis of this claim was not available at the time he filed his initial state post-conviction application for relief. Similarly, he does not allege that in the absence of any constitutional errors no rational juror could have voted to convict him or sentence him to death. Accordingly, it is entirely clear that the state court would refuse to reach the merits of this claim if the Court allowed Cobb to present it in a successive petition. The Court will treat this claim as if it has already been procedurally defaulted.

Federal courts generally do not review procedurally defaulted claims unless the applicant can establish either that he had good cause for failing to fairly present his claims, and he would be prejudiced by not being given an opportunity to do so in the federal court, or that the federal court's failing to address the claims on their merits would result in a fundamental miscarriage of justice, either because he is actually innocent of the offense, *see Coleman v. Thompson,* 501 U.S. 722, 749-50 (1991), or because but for the constitutional error no rational juror would have found him eligible for the death penalty under state law, *see Sawyer v. Whitley*, 505 U.S. 333, 336 (1992). Cobb does not contend that he had good cause for failing to raise this claim in his initial state post-conviction application for relief, and he does not contend either that he is actually

innocent of killing Vandever, or that no reasonable juror would have voted to sentence him to death had they only been instructed that they were required to consider the evidence he presented in mitigation, so the Court will dismiss Cobb's sixth claim with prejudice.

Cobb's seventh claim is that the Texas death penalty scheme is unconstitutional in violation of the Eighth Amendment as interpreted in *Penry v. Johnson*[11] because the mitigation special issue sends mixed signals to the jury, thereby rendering any verdict reached in response to that special issue unreliable.  This claim was rejected on the merits in Cobb's direct appeal, *see Cobb v. State*, No. AP-74,875, 2007 WL 274206 (Tex. Crim. App. Jan. 31, 2007), so the issue for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States.

In *Penry v. Johnson,* the Supreme Court held that the capital sentencing scheme in use in Texas at that time violated the Eighth Amendment because the special sentencing issues did not provide jurors with the ability to give effect to mitigating evidence.  The Jurors in Penry's trial were required to answer three special issues: (1) whether the conduct of the defendant which resulted in the death of the victim was deliberate; (2) whether there is a probability that the defendant will be dangerous to society in the future; and (3) whether the defendant's conduct was unreasonable in response to the provocation (if any) by the deceased.  The jurors were then instructed that if they found sufficient mitigating evidence to warrant a life sentence, they should answer at least one of the three special issues in the negative.  Because the last instruction in effect told the jurors to answer one of the three special issues dishonestly if they wanted the

---

[11]532 U.S. 782 (2001).

defendant to receive a life sentence, the Supreme Court held that giving of this instruction along with an instruction to "follow the law and your oath as jurors" sent "mixed signals" to the jury about its responsibilities.

The mitigation special issue in the present case does not require a juror to answer other special issues negatively.  Instead, it simply asks the juror whether, considering all of the evidence, the juror believes that a life sentence, rather than a death sentence, should be imposed. Cobb nevertheless contends that the jury in his case still received mixed signals from the special sentencing issues, because the mitigation question does not contain any information about the burden of proof, and the jurors are misled into believing that ten of them must vote for a life sentence in order for that sentence to be imposed, when in fact only one vote is necessary.

Cobb's first contention has been specifically rejected by the United States Court of Appeals for the Fifth Circuit.  *See Coleman v. Quarterman*, 456 F.3d 537 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007).  In addition, the mitigation special issue which was used in Cobb's case was discussed in the *Penry v. Johnson* case and implicitly endorsed by that Court. *See* 532 U.S. at 803.  For these reasons, the Court finds that the state court's denial of this claim (by upholding the constitutionality of the mitigation special sentencing issue) is neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Penry v. Johnson*.  The Court will deny Cobb's seventh claim.

Cobb's eighth claim is that the Texas death penalty scheme is unconstitutional because it provides the jury unfettered discretion as prohibited by the Supreme Court's decision in *Furman*

*v. Georgia.*[12] This claim was rejected on the merits in Cobb's direct appeal, *see Cobb v. State*, No. AP-74,875, 2007 WL 274206 (Tex. Crim. App. Jan. 31, 2007), so the issue for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court.

The Eighth Amendment's ban on cruel unusual punishment requires that a state's capital sentencing statutes accomplish two purposes.  First, the scheme must channel the sentencer's discretion in order to genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a more severe sentence on the defendant compared with other defendants found guilty of murder.  Once a defendant has been found death eligible, the sentencing scheme must allow the sentencer to consider any relevant evidence that might lead it to decline to impose the death penalty.  *See McCleskey v. Kemp*, 481 U.S. 279, 305-06 (1987).

The Justices have recognized that the unfettered discretion allowed at the death imposition stage undermines to some extent the attempt to eliminate arbitrariness at the death eligibility stage.  For example, in *Callins v. Collins*, 510 U.S. 1141, 1144 (1994), Justice Blackmun, dissenting from the denial of *certiorari*, stated: "Experience has taught us that the constitutional goal of eliminating arbitrariness and discrimination from the administration of death . . . can never be achieved without compromising an equally essential component of fundamental fairness - individualized sentencing."  In *Johnson v. Cockrell*, 306 F.3d 249 (5th Cir. 2002), however, the United States Court of Appeals for the Fifth Circuit rejected this very claim. In light of *Johnson*, the Court finds that the state court's rejection of this claim was neither

---

[12]408 U.S. 238 (1972).

contrary to nor involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *McCleskey v. Kemp*.[13]   The Court will deny Cobb's eighth claim.

Cobb's ninth claim is that the Texas death penalty scheme is unconstitutional because it prevents meaningful appellate review.   The state court found this claim procedurally barred, but also denied relief on the merits, *see* SHR Vol. 2, p. 106.   As explained above, the rule in this circuit is that under these circumstances a federal court must, in the absence of good cause and prejudice, or a fundamental miscarriage of justice, deny relief because of the procedural default, but the rule is not absolute; a court can look past the question of procedural default if the claims can be resolved more easily on the merits.   This issue is easier to resolve on the merits because it has been specifically rejected by the United States Court of Appeals for the Fifth Circuit in *Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000), *cert. denied*, 532 U.S. 949 (2001).

The Supreme Court of the United States has repeatedly emphasized that meaningful appellate review of death penalty cases is essential.  *Clemons v. Mississippi*, 494 U.S.738, 749 (1990).  Cobb is correct that because under Texas law juries can have unfettered discretion in considering mitigating evidence, an appellate court cannot determine whether their decision at the death selection phase of the sentencing process was correct or reasonable.   In *Moore v. Johnson*, however, the United States Court of Appeals for the Fifth Circuit held that the Constitution requires only that an appellate court be able to review the reasonableness of the death eligibility decision; no mechanism need be provided for it to determine whether the jurors

---

[13] Although Cobb claimed that the unfettered jury discretion at the death imposition stage was contrary to *Furman,* because his argument addressed the unfettered jury discretion at the death eligibility phase, the Court analyzed his claim under *McCleskey.*

gave appropriate weight to mitigating evidence.  225 F.3d at 506-07.  In light of *Moore*, the

Court finds that the state court's denial of this claim was neither contrary to nor the result of an

unreasonable application of clearly established federal law, as determined by the Supreme Court

of the United States in *Clemons v. Mississippi*.  The Court will deny Cobb's ninth claim.

 Cobb's tenth claim is that the Texas death penalty scheme is unconstitutional because it

is founded on the jurors' inability to predict future danger in violation of the Fifth, Sixth, Eighth

and Fourteenth Amendments.  This issue was raised at trial, but not on direct appeal or in state

post-conviction proceedings, so it is unexhausted.  As explained previously, when a petitioner

raises an unexhausted claim, a federal court has three options: it can allow the petitioner to return

to state court and exhaust the claim, treat the claim as if it had been procedurally defaulted, or

deny the claim on its merits.   Because of binding precedent on the issue, the Court finds that

denying this claim on the merits is the appropriate course.

Under Texas law, a capital defendant becomes eligible for the death penalty if the jury

finds beyond a reasonable doubt that there is a probability that he will commit acts of criminal

violence which constitute a continuing threat to society.  In *Flores v. Johnson*, 210 F.3d 456,463

(5th Cir. 2000), the Honorable Emilio M. Garza, concurring, stated:

> The scientific community virtually unanimously agrees that psychiatric testimony
> on future dangerousness is, to put it bluntly, unreliable and unscientific.  It is as
> true today as it was in 1983 that neither the court nor the State of Texas has cited
> a single reputable scientific source contradicting the unanimous conclusion of
> professionals in this field that psychiatric predictions of long-term future violence
> are wrong more often than they are right.

Cobb contends that since jurors do not receive accurate information from experts, their

determinations about future dangerousness cannot be a valid way to distinguish death eligible

murderers from murderers in general.  In *Jurek v. Texas*, 428 U.S. 262, 274-75 (1976), however,

the Supreme Court of the United States rejected this precise argument:

> Focusing on the [future dangerousness sentencing issue] the petitioner argues
> that it is impossible to predict future behavior and that the question is so
> vague as to be meaningless.  It is, of course, not easy to predict future behavior.
> The fact that such a determination is difficult, however, does not mean that it
> cannot be made.  Indeed, prediction of future criminal conduct is an essential
> element of many of the decisions rendered throughout our criminal justice
> system.  The decision whether to admit a defendant to bail, for instance, must
> often turn on a judge's prediction of the defendant's future conduct.  And any
> sentencing authority must predict a convicted person's probable future conduct
> when it engages in the process of determining what punishment to impose.  For
> those sentenced to prison, these same predictions must be made by parole
> authorities.  The task that a Texas jury must perform in answering the statutory
> question in issue is thus basically no different from the task performed
> countless times each day throughout the American system of criminal justice.
> What is essential is that the jury have before it all possible relevant information
> about the individual defendant whose fate it must determine.  Texas law clearly
> assures that all such evidence will be adduced.

The Court notes that in *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976), the Supreme

Court held that because a sentence of death was qualitatively different from a sentence of life

imprisonment, there is a need for heightened reliability in the determination that death is the

appropriate punishment in a particular case.  The Court is obliged to point out that the fact that

predictions about future dangerousness are routinely made in lesser contexts does not justify

ignoring their lack of reliability in the capital punishment context.  The Court agrees with the

United States District Court for the District of Massachusetts that *Jurek* should be revisited.  *See*

*United States v. Sampson*, 335 F. Supp. 2d 166, 218 (D. Mass. 2004).  Nevertheless, *Jurek*

compels this Court to deny Cobb's tenth claim.

Cobb's eleventh and final claim is that the Texas death penalty scheme is unconstitutional

for its failure to provide proportionality review.  This issue was raised at trial, but it was not

raised either on direct appeal or in state post-conviction proceedings, so it is unexhausted.  As

explained previously, with unexhausted claims a federal court has three options: allow the petitioner to return to state court and present the claim, treat the claim as if it were procedurally defaulted, or deny the claim on its merits.   Because of binding precedent on the issue, the Court finds that denying this claim on the merits is the appropriate course.

Cobb contends he thought at the time that he and Adams were only going to rob the store, that the kidnaping, rape, and killings were all Adams's idea, and that Cobb participated reluctantly, trying to the end to resolve the situation without anyone getting hurt but eventually concluding that his only viable option was to do what Adams told him to do.  Cobb contends the Texas death penalty sentencing scheme is unconstitutional because it does not require the Court of Criminal Appeals to review the severity of punishment imposed on other defendants whose participation in capital offenses was comparable to his in order to determine whether the death sentence he received was disproportionate.

In *Pulley v. Harris*, 465 U.S. 37, 44-54 (1984), the Supreme Court of the United States held that the Eighth Amendment does not require that a state appellate court compare the sentence imposed in the case before it with the penalties imposed in similar cases, if requested to do so by the petitioner.[14]   *Pulley* compels the Court to deny Cobb's eleventh and final claim.[15]

_____

[14] Although the Constitution of the United States does not require appellate courts to provide proportionality review, evidence and argument about the proportionality of a death sentence can be presented to the Texas Board of Pardons and Paroles in clemency proceedings.

[15] Cobb contends that because twenty-two of the thirty-eight states which allow capital punishment do require their appellate courts to conduct a proportionality review in cases in which the death penalty is imposed, the public consensus about the process due a capital defendant is now sufficiently clear for the Supreme Court to reconsider its holding in *Pulley*.  Cobb is correct that the Cruel and Unusual Punishment Clause of the Eighth Amendment draws its meaning from the evolving standards of decency that mark the progress of a mature society, *see Rhodes v. Chapman*, 452 U.S. 337 (1981), and the fact that almost two-thirds of the legislatures in states which allow capital punishment provide proportionality review of death sentence is reasonably strong evidence of evolving standards, *compare Atkins v. Virginia*, 536 U.S. 304, 312,313 (2004), but overruling *Pulley* would necessarily create a new rule of constitutional criminal procedure, and such rules may not be applied to cases pending on collateral review at the time the rule is adopted.  *See Teague v. Lane*, 489 U.S. 288 (1989).

**Conclusion**

For the above reasons, the Court will dismiss Cobb's sixth claim with prejudice, deny his remaining ten claims, and deny his application for a writ of *habeas corpus*. An Order and Judgment to this effect will be entered.

**SIGNED this 15th day of February, 2011.**

_____
DAVID FOLSOM
UNITED STATES DISTRICT JUDGE